In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1819

JANICE M. GAWLEY,

Plaintiff-Appellant,

v.

INDIANA UNIVERSITY,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 96 C 466--Larry J. McKinney, Chief Judge.

ARGUED NOVEMBER 30, 2000--DECIDED December 31, 2001


Before FLAUM, Chief Judge, and EASTERBROOK
and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Janice Gawley
sued her employer for sexual harassment,
hostile work environment, retaliation,
and the Indiana tort of spoliation of
evidence. The district court first denied
summary judgment, then changed course
after the Supreme Court issued two key
decisions, and granted summary judgment
in favor of the employer. We affirm.

A.

We credit Gawley's version of the facts
and draw all reasonable inferences in her
favor because she is the party opposing
summary judgment. Hostetler v. Quality
Dining Inc., 218 F.3d 798, 802 (7th Cir.
2000). Gawley worked as a police officer
for the Indiana University Police Depart
ment from 1983 until 1996. Her immediate
supervisors were Sergeant McClain and
Lieutenant Shutte, who in turn reported
to Captain Wilken. Captain Wilken
reported to Chief Norris. In the absence
of her regular shift commanders, other
persons ranking above her in the police
department's paramilitary structure
directed her work assignments. Jerry
Minger was a lieutenant in the
department's Uniform Division, and his
main responsibilities involved uniforms
and equipment. As the department

quartermaster, he felt responsible for pointing out elements of behavior or appearance that required correction. Some department records referred to Minger as a department supervisor, and his job description specified that he had command responsibilities over subordinate personnel in emergency situations. At times, Minger filled in as Gawley's shift commander and initiated a disciplinary procedure against her on one occasion. He also supervised Gawley when she performed public relations duties. According to other department personnel, Minger had some supervisory authority over all officers who ranked below him in the department's paramilitary organization. He also had some disciplinary authority over lower ranking officers such as Gawley. That authority was limited in certain areas. For example, while Minger had authority over uniforms, weapons and equipment, he did not have final authority to hire or fire employees. He was, however, authorized to initiate disciplinary proceedings against junior officers relating to any aspect of the officer's conduct.

Apparently in his role as quartermaster, Minger began commenting to Gawley in November 1994 about the fit of her pants. In particular, he remarked in an offensive manner on a number of occasions that Gawley's pants were too tight, and that she was overweight./1 He made these comments in a demeaning manner in front of other department personnel. At times, he made up to three comments a day. For example, in front of other personnel, Minger told Gawley she was "getting bigger than a barge," and in front of visiting government personnel, he yelled across a street "Hey, Gawley, pants are too tight" or "Pants seem awfully tight" while laughing. When fitting Gawley for a bullet proof vest, he remarked about her breast size, saying "a D cup, that's big wow." He continued to remark about her breast size at two other fitting sessions and finally groped her breast while adjusting a bullet proof vest on her. Two other officers witnessed the groping incident, and one commented that if Minger had done this to her, she would have punched him. Gawley estimated that she asked Minger to stop making the offensive comments at least ten times. On two occasions when she asked Minger to stop, other officers were present,

including a sergeant and a fellow officer who later became a sergeant. Gawley also produced evidence that the department had a history of sexual harassment of its female employees dating back to the early 1980s. Other female employees related a number of incidents over the years involving Minger and other male employees who made offensive gestures and comments to female employees.

On June 14, 1995, Gawley lodged her first formal complaint about Minger through internal department procedures. She did not mention Minger's breast groping in that complaint because she was embarrassed by the incident, and believed she would have an opportunity to bring it to light during the investigative process. Captains Wilken and Poliskie investigated Gawley's complaint. They interviewed Minger several times, but did not question Gawley at that time. They did not contact Deborah Delay, an employee who wrote a memorandum corroborating Gawley's version of events. In the meantime, on June 22, Gawley went to the university's Office of Women's Affairs ("OWA") to discuss her complaint. She told the intake counselor about the groping incident, and the counselor led her to believe there was nothing OWA could do about the incident. Gawley next approached the Office of Affirmative Action ("OAA"), where she did not mention the groping incident to investigator Tammy Chappell because she was angry and believed she would get the same response as was given by the OWA. The next day, Gawley met with Wilken, Poliskie andLieutenant Timothy Lewis.

Wilken spoke with Chappell that day as well, and Wilken then decided to issue a counseling memorandum to Minger based on the comments about Gawley's pants, weight and breast size. The memorandum did not address the groping incident, which Gawley had not yet mentioned to Wilken./2 According to Gawley, Wilken had accepted at face value Minger's claim that he had not intended to offend Gawley when he made these various comments, in spite of the fact that the university's sexual harassment policy provided that a claim that the harassment was unintentional is disallowed as a defense. Minger's harassment of Gawley ceased as of June 1995, after he received the counseling memorandum.

Although the counseling memorandum issued and the harassment stopped, the investigation continued through the other procedures that Gawley initiated. Chappell drafted a report as a result of OAA's investigation, and on August 30, 1995, faxed the draft to Chief Norris, stating that she did not anticipate any major changes to the draft. Chief Norris reacted with anger upon reviewing the draft. He did not attend a meeting scheduled to discuss the draft, and Chappell later apologized to Norris for any misunderstandings about the report. Although Gawley never saw any reports (or drafts) issued by OAA, Norris shared the report with Minger and other personnel. Ultimately, the report was changed to remove many of the conclusions Chappell reached that were critical of Minger and the department. The recommendations in the watered-down report were never implemented. The university never issued a final report, and Norris refused to meet with Gawley during this time period.

Gawley believed that some of the actions taken during the investigation were retaliation for her complaints of sexual harassment. For example, Norris released a copy of the OAA report to Lieutenant Butler, a department officer not in Gawley's chain of command. Butler then wrote a memo highly critical of the report. Gawley also complained that Schutte ordered her to lie on a case report, that her case reports were subject to greater scrutiny than other officers' reports, that she was subjected to silent treatment by department administrators, and that the department's open-door policy was closed to her. Sergeant McClain told her she would be demoted if she did not renew her "IDACS" certification, even though three other officers in the same grade as Gawley did not renew their certification and none were threatened with demotion. McClain also ordered her to learn the new "CADS" system, telling her she would be tested on it, even though all the other officers in her shift were told the training would be voluntary./3 Finally, she was the last officer to receive a bullet proof vest, for which Minger had procurement responsibility. As a result of all of these events, Gawley resigned on January 3, 1996, characterizing her departure as constructive discharge.

She had filed her first charge of discrimination with the EEOC on December 5, 1995. In that charge, she alleged that Minger subjected her to pervasive sexual harassment by commenting inappropriately about the fit of her pants, by commenting inappropriately about her breast size, and by inappropriately touching her breast under the guise of adjusting her bullet proof vest during a fitting session. She alleged that the internal procedures for reporting this harassment had proved ineffectual, and that Minger had not been appropriately disciplined. She filed a second charge on December 19, 1995, which she concedes does not allege retaliation. On February 15, 1996, she filed an amendment to her first charge. That amendment alleged that since December 5, 1995, and unknown to her at that time, Chief Norris waged a campaign of retaliation against her for having filed complaints of sexual harassment against Minger. She pointed to Norris' disclosure of the OAA report to Butler as evidence of this retaliation. She did not specifically allege any other incidents as evidence of retaliation. She explains that she did not allege retaliation in her first two EEOC charges because it was not until she learned of the disclosure to Butler that she realized the problems she had faced in her final days at the university were the result of retaliation for charging Minger with sexual harassment. After filing her formal complaint, Gawley became aware that OAA investigator Chappell had destroyed a number of documents, drafts and notes on the instructions of the director of the OAA, who told Chappell to use her judgment in deciding what to keep and what to discard, a comment that Chappell took as a directive to destroy drafts.

The university moved for summary judgment in the district court, and the court initially denied the motion. As the parties prepared for trial, the university successfully moved to exclude evidence from Gawley's expert, a psychologist who planned to testify about patterns of behavior and organizational structure. In the meantime, as we will discuss below, the law of sexual harassment as it relates to supervisors was clarified by the Supreme Court in two major decisions, and the university decided to file new motions for summary

judgment, first on the sexual harassment claim, and then on Gawley's claims for constructive discharge, retaliation and the Indiana tort of spoliation of evidence./4 This time, the court granted summary judgment in favor of the university on all of Gawley's claims. Gawley appeals.

II.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Hostetler, 218 F.3d at 806. We review the district court's summary judgment ruling de novo, construing the record in the light most favorable to the non-movant, Gawley. Id. Gawley contends that the district court erred by: (1) finding that Minger was not Gawley's supervisor as a matter of law; (2) ruling that Gawley was not the victim of a hostile environment; (3) holding that evidence of harassment of other women and retaliation against other women should be excluded; (4) finding that Gawley failed to preserve her retaliation claim by not bringing it in her EEOC charge; (5) holding that Gawley could not establish a prima facie case of retaliation; (6) ruling that Gawley's constructive discharge claim failed as a matter of law; (7) excluding the testimony of Gawley's proposed expert; and (8) finding that Gawley's claim for spoliation of evidence failed because she could not prove damages.

A.

We consider the supervisor issue first. Gawley maintains that even though Minger was not in her direct chain of command, he was her superior officer in the department's paramilitary hierarchy. As such, she was obliged to obey his orders in the field. At certain times such as special visits to the campus, and in certain areas such as uniforms and equipment, he held supervisory authority over her. She concedes he did not have the authority to hire or fire employees, but maintains that he was authorized to initiate disciplinary proceedings against her, and apparently did so on one occasion unrelated to any of these events. The university maintains that Minger was not Gawley's supervisor as a matter of law. He did not have

immediately or successively higher authority over her because he could not hire or fire her, and did not have authority of substantial magnitude over her.

The parties are engaged in this battle over the meaning of "supervisor" because of the Supreme Court's holdings in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). In those cases, the Court defined the criteria for an employer's vicarious liability for sexual harassment committed by employees. Citing the Restatement (Second) of Agency, the Court noted that an employer is typically not liable for the torts of its employees acting outside the scope of their employment unless (a) the employer intended the conduct or the consequences; (b) the employer was negligent or reckless; (c) the conduct violated a non-delegable duty of the employer; or (d) the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relationship. Ellerth, 524 U.S. at 758, citing Restatement 2nd of Agency sec. 219(2). As in the instant case, the Court was not faced with intentional conduct by the employer or a non-delegable duty, and so subsections (a) and (c) of Section 219, paraphrased above, were found inapplicable. Subsection (b) imposes liability on the employer who is negligent. Gawley seeks to impose the more stringent standard of vicarious liability detailed in subsection (d), but she also asks that if we find Minger to be a mere co-employee, we also find that she presents enough evidence to survive the university's motion for summary judgment under that standard as well. We will consider subsection (d) first.

In Ellerth, the Supreme Court divided subsection (d) into two parts. The first, dealing with apparent authority, was held inapplicable because the plaintiff was accusing her putative supervisor of the misuse of actual power. Apparent authority comes into play only when the offending employee creates a false impression of having the power to act on behalf of the employer. As in Ellerth, Gawley makes no such claim here and so we

will not consider that provision further. The Court then considered the "aided in the agency relation" standard, which is the standard at issue in the instant case. The Court found that most workplace tort-feasors are aided in accomplishing their tortious conduct by the existence of the agency relationship. 524 U.S. at 760. Indeed, "[p]roximity and regular contact may afford a captive pool of potential victims." Id. However, this broad interpretation of the provision would subject employers to vicarious liability not only for supervisor harassment but for co-worker harassment as well. The Court found that the "aided in the agency relation" language required something more than the employment relationship itself. Id. The Court found that when a supervisor takes a tangible employment action against a subordinate, the standard will be met because the supervisor is clearly aided by the agency relationship in the commission of the harassment. 524 U.S. at 760. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. at 761. Gawley does not claim that she suffered a tangible employment action, so we must consider the other circumstances under which the Court held that an employer might be vicariously liable./5

   The court noted that when the harassment does not culminate in a tangible employment action, whether the agency relationship aids in the supervisor's harassment is less obvious. 524 U.S. at 763. In one sense, the Court noted, a supervisor is always aided by the agency relationship because the supervisor's power and authority "invests his or her harassing conduct with a particular threatening character." Id. But there are also some acts a supervisor might commit that are identical to conduct in which a co-employee might engage, and the supervisor's status would make little difference. The Court declined to "render a definitive explanation of [its] understanding of the standard in an area where other important considerations must affect [the Court's] judgment" in this developing area of agency law. 524 U.S. at 763. The Court instead adopted

the following holding:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Ellerth, 524 U.S. at 765.

The Court further explained in Faragher that a victim of harassment "can walk away or tell the offender where to go" when the harasser is a fellow employee, but few are willing to accept the risks of blowing the whistle on a supervisor, who has the power to hire and fire and to set work schedules and pay rates. 524 U.S. at 803. Moreover, an employer has greater opportunities to guard against misconduct by supervisors than by common workers. In particular, employers have greater opportunity and incentive to screen, train and monitor supervisors. 524 U.S. at 803. The Court reiterated in Faragher that the employer could defend against a charge of harassment by a supervisor by demonstrating that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and by demonstrating that the complaining employee failed to take advantage of the employer's safeguards or otherwise avoid harm that could have been prevented. 524 U.S. at 805-07.

With those standards in mind, we examine Gawley's claim against the university. It is undisputed that, in the normal course of business, Minger was not Gawley's

immediate or successively higher supervisor. He was, however, her commanding officer on at least two occasions when he chose to harass her with inappropriate comments about the fit of her pants, during special visits to the campus by Janet Reno and Warren Christopher. He was also a supervisor in charge of uniforms and equipment, and in that capacity, he had special access to Gawley during the fitting of her bullet proof vest, and used that access to grope her breast. He did not have the power to hire or fire her, but did have the ability to initiate disciplinary proceedings against her. He also had the ability to delay her receipt of a critical piece of equipment, namely her bullet proof vest. The university makes much of the fact that the wearing of a bullet proof vest was voluntary and officers had only recently negotiated through their union to require the university to provide vests to officers who requested them. The voluntary nature of wearing the vests is irrelevant here, however, because Gawley had requested a vest. Moreover, Minger's ability to delay distribution of equipment to a subordinate employee is relevant to the analysis of whether his position as a supervisor aided him in the commission of the harassment. If, as in Ellerth and Faragher, he was entrusted with powers that rendered subordinates less likely to blow the whistle on him, then he was aided by the agency relationship in harassing subordinate employees. See also Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1034 (7th Cir. 1998) (the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment). Gawley also points out that the department operated in a paramilitary hierarchy, which meant that subordinate officers were obliged to obey the commands of all superior officers, not just those who were in their direct line of supervision. On the other hand, Gawley had access to department procedures to complain about Minger's conduct, and was able to complain to her direct superiors without having to proceed through Minger's chain of command at all. On summary judgment, we are reluctant under these unusual circumstances to find that Minger was not, as a matter of law, aided in the commission of the harassment by his supervisory position. Cf. Mikels v.

City of Durham, N.C., 183 F.3d 323, 334 (4th Cir. 1999) (police officer could not show harasser was aided by the agency relationship where harasser was superior in rank only, he had no authority to take tangible employment actions against the officer, only occasionally had authority to direct the officer's operational conduct while on duty, and the officer was not isolated from the continuing protective power of higher management in the department). We need not definitively decide this question, however, because even if we assume Minger was a supervisor as defined in Ellerth and Faragher, the university was entitled to raise an affirmative defense.

We consider the issue of the university's affirmative defense because Minger's harassment did not involve atangible employment action as that term was defined by the Supreme Court in Ellerth and Faragher. He did not fire Gawley, nor fail to promote her, nor reassign her to a post with significantly different responsibilities. He made harassing comments about her pants, her weight and her breasts, and he touched her breast during a fitting. The university, therefore, may defend against Gawley's charges by demonstrating that (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) Gawley unreasonably failed to take advantage of any preventive or corrective opportunities provided by the university or to avoid harm otherwise. Faragher, 524 U.S. at 807. Gawley concedes the university had a system in place for employees to report sexual harassment, and also concedes that as soon as she used the system, the university took action and the harassment stopped. Although she contends that the university conducted an inadequate investigation of the incidents, and that the warning issued to Minger was lacking, she agrees that the investigation and warning resulted in a cessation of Minger's offensive conduct. In the face of this evidence that the university had a procedure in place to handle harassment, Gawley has no evidence that the university failed to exercise reasonable care in preventing and correcting theharassing behavior.

We turn to the second part of the

employer's defense, whether Gawley unreasonably failed to take advantage of any preventive or corrective opportunities provided by the university or to avoid harm otherwise. In Faragher, the Supreme Court explained the rationale for this second prong of the employer's defense:

The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. . . . An employer may, for example, provide a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

Faragher, 524 U.S. at 806-07 (internal citations omitted). The purpose of this requirement is tied to Title VII's primary objective, which is not meant to provide redress but rather to avoid harm. Id., 524 U.S. at 805-06./6 As an incentive to employers who implement reasonable procedures designed to prevent harassment of employees, there will be no liability if employees fail to take advantage of the procedures. Id. On this second prong, the evidence is also undisputed. Minger harassed Gawley for a period of approximately seven months. At times, he made up to three inappropriate comments to her each day. During this time, she told Minger at least ten times to stop harassing her. Even though her informal approach was not working, she waited seven months before availing herself of the formal complaint procedures available through the university. As soon as she used the formal procedures, which did not require

her to complain to the harasser but provided an alternate channel for her complaint, the university took action and the harassment stopped. Gawley's neglect of the university's formal procedures during seven months of escalating harassment, in combination with the insufficiency of her repeated informal efforts to stop Minger constitute an unreasonable failure to take advantage of the university's corrective procedures. Given Gawley's concessions, and using the standard's set out in Ellerth and Faragher, the district court was therefore correct to grant summary judgment in favor of the university on this claim./7

B.

We turn then to Gawley's claims of retaliation. She filed two EEOC charges, one on December 5 and the other on December 19, 1995. Initially, she did not claim retaliation in either charge. On February 15, 1996, after she left her employment at the university, she amended the first charge to include a claim of retaliation. Specifically, she alleged that since December 5, 1995, and unknown to her at that time, Chief Norris waged a campaign of retaliation against her for having filed complaints of sexual harass ment against Minger. She pointed to Norris' disclosure of the OAA report to Butler as evidence of this retaliation. She did not allege any other incidents as evidence of retaliation at that time. As we noted above, she explains that she did not allege retaliation in her first two EEOC charges because it was not until she learned of the disclosure to Butler that she realized the problems she had faced in her final days at the university were the result of retaliation for charging Minger with sexual harassment. In hercomplaint, Gawley alleged that after she reported Minger's harassment to the OWA and the OAA, Norris treated her complaints in a frivolous and disrespectful manner, and the university failed to take corrective action. According to Gawley, this retaliation caused her constructive discharge.

On appeal, Gawley concedes that even her amended EEOC charge did not allege she was ordered to lie on a case report, her case reports were subjected to greater scrutiny, she was threatened with

demotion if she did not renew her IDACS certification, she was forced to complete CAD training, she was ostracized by the rest of the department, and she was the last officer to receive her bullet proof vest. She maintains that her charge need not be so specific, that her claims are preserved so long as the claims in her charge are alike or reasonably related to the claims in her later lawsuit. Because she now believes Chief Norris was the driving force behind all of these allegedly retaliatory acts, she contends her claims should stand. The university counters with our opinion in McKenzie v. Illinois Dept. of Transp., 92 F.3d 473 (1996), asserting that Gawley is now confined to the four corners of her EEOC charge, which claimed only that the university mishandled her harassment claim.

  We noted in McKenzie that, generally, a Title VII plaintiff may bring only those claims that were included in her original EEOC charge, or that are like or reasonably related to the allegations of the charge or growing out of the charge. 92 F.3d at 481 (citing Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994) and Jenkins v. Blue Cross Mut. Hosp. Ins., 538 F.2d 164, 167 (7th Cir.), cert. denied, 429 U.S. 986 (1976)). We explained that to meet this standard, the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals. McKenzie, 92 F.3d at 481. The purpose of this requirement is to afford the EEOC and the employer an opportunity to settle the dispute through conference, conciliation and persuasion, and also to give the employer some notice of the conduct of which the employee is aggrieved./8

  Gawley's late claim that Chief Norris is somehow responsible for all of these acts committed by other members of the department fails for two reasons. First, she has produced no evidence that Norris was involved in any of these acts. Smart v. Ball State University, 89 F.3d 437, 440 (7th Cir. 1996) (in making out prima facie case of retaliation, employee must show, inter alia, a causal connection be tween the adverse employment action and her participation in the protected activity). Second, in her own statement of facts, she attributes the order to lie

on the case report to Lt. Schutte, she fails to identify who subjected her case reports to greater scrutiny or who would not speak to her, she attributes the delay in receiving the bullet proof vest to Minger, and she notes that Sergeant McClain is the person who threatened her with demotion if she did not renew her IDACS certification and if she did not complete CAD training. Thus, her allegations involve different persons and different conduct from that asserted in her EEOC charge.

Under McKenizie, the only claim of retaliation that may stand is her claim that Norris treated her complaints of sexual harassment in a frivolous and disrespectful manner. In particular, he distributed the report to Lt. Butler, Minger and others, and he strongly criticized the report. In order to state a claim for retaliation, however, Gawley must show more than this. See Ribando v. United Airlines, Inc., 200 F.3d 507, 510–11 (7th Cir. 1999). In particular, Gawley must show she has suffered some materially adverse action. Id. "Materially adverse" means more than a mere inconvenience or alteration of job responsibilities. Examples of conduct meeting the "materially adverse" standard include termination of employment, demotion, a decrease in wages, a less distinguished title, or a material loss of benefits. Id. This list is not exhaustive and we have acknowledged that the materially adverse action may be unique to the situation. Ribando, 200 F.3d at 511; Aviles, 183 F.3d at 606 (a deliberately false report to police that an employee was armed and lying in wait outside the plant could be construed as materially adverse retaliatory action intended to discourage employee from pursuing claim). In any case, Gawley's claims that Norris criticized the OAA report and distributed it to personnel who had no right to receive it do not meet the standard for materiality. "[N]ot everything that makes an employee unhappy is an actionable adverse action." Ribando, 200 F.3d at 511 (quoting Smart, 89 F.3d at 441). In Ribando, we declined to find that placing a letter of concern or counseling in the complaining employee's personnel file constituted a materially adverse action. See also Rabinovitz v. Pena, 89 F.3d 482, 488–89 (7th Cir. 1996) (loss of bonus not

adverse employment action when employee not automatically entitled to bonus). Indeed, Gawley concedes in her brief on appeal that Norris' actions "may not have directly resulted in any material changes in the terms and conditions of Gawley's employment." Appellant's Brief at 40. Instead, Gawley points to Norris' anger with the OAA report as the cause of the other retaliatory actions she now alleges (e.g., the delay in receiving her vest, being ostracized in the department). Norris' criticism of and distribution of the report falls into the same class of acts as an unfavorable letter in the employee's file, and we therefore find that summary judgment in favor of the university was appropriate on this claim as well.

C.

Gawley next defends her claim of constructive discharge, stating that the totality of the circumstances to which she was subjected rendered her working conditions intolerable. We begin with Norris' actions after Gawley complained about Minger. Gawley concedes that she was not aware of Norris' distribution and criticism of the report until after she left her employment at the university. Therefore, these actions by Norris could not have been the cause of her constructive discharge. That leaves her other charges, that she was subjected to harassing comments about her pants and breasts, that Minger sexually assaulted her with impunity when he groped her breast, she was the last officer to receive her vest, and that her reports were more severely scrutinized. Constructive discharge occurs when an employee's discriminatory working conditions become so intolerable that a reasonable person in her position would be compelled to resign. Sweeney v. West, 149 F.3d 550, 557 (7th Cir. 1998). We held in Sweeney that an employee can be constructively discharged only if the underlying working conditions were themselves unlawful or discriminatory in some fashion. 149 F.3d at 557-58. We also noted there that a constructive discharge claim requires evidence that quitting was the only way the plaintiff could extricate herself from the intolerable conditions. Id. That requirement eliminates from consideration all of Minger's harassing comments about her

pants and her breasts as well as the groping of her breast because, as we found above, Gawley waited seven months before availing herself of the formal procedures the university established for victims of harassment even though her informal efforts to protect herself were unsuccessful on at least ten occasions by her own account. As soon as she complained, the university took action and Minger's objectionable conduct stopped. Nor did she formally complain about the delay in getting her bullet proof vest. She remained on the job for two months after receiving the vest, as well, indicating that the delay had not caused her work conditions to become so intolerable as to cause her to leave her job. The other evidence of adverse working conditions is insufficiently severe to cause a reasonable person to quit the job. Finally, quitting was not the only option available to Gawley because of the university's procedures for victims of harassment.

Gawley complains that the university placed her in a "damned if you do, damned if you don't situation." She is being penalized, she alleges, for living with the conditions for seven months before resigning, while trying to seek redress. We disagree with this characterization. Gawley did try to use informal means to resolve the conditions she encountered on the job. But she did not use the formal complaint procedure at her disposal even when her informal efforts repeatedly failed. We might have a different case if the most egregious conduct occurred first, before Gawley had an opportunity to use the university's procedures. For example, if Minger began his harassing conduct by groping Gawley, conduct that would constitute a criminal act in many jurisdictions, we might have a different case. But what we have instead is a steady escalation of harassing behavior, over many months, with the victim failing to use the procedures her employer put into place until especially egregious conduct occurred. And even then, Gawley did not initially disclose the worst of Minger's behavior. Nor did she use the system to complain that Minger was then delaying the issuance of her bullet proof vest, presumably in retaliation for complaining about his harassing conduct./9 She did not complain to her employer about much of the harassment

under the university's procedures, she did not include much of the offending conduct in her EEOC charges, and she cannot, therefore, defeat the university's motion for summary judgment on this claim.

D.

The district court granted summary judgment in favor of the university on Gawley's state-law spoliation of evidence claim as well. Gawley based the claim on Chappell's destruction of drafts of the OAA investigative reports and other documents after the lawsuit was filed. Indiana arguably recognizes a tort for spoliation of evidence under certain circumstances. See Thompson v. Owensby, 704 N.E.2d 134 (Ind. Ct. App. 1998); Reinbold v. Harris, 2000 WL 1693792 (S.D. Ind. Nov. 7, 2000). The district court noted that even if Indiana recognizes such a tort, one necessary element would be damages. The court granted judgment in favor of the university because none of Gawley's substantive claims could be saved by the missing evidence, and therefore she could not show damages. Gawley seems to concede in her brief that if her substantive claims fail, so does her spoliation claim./10 We agree with the district court that Gawley cannot show damages, and therefore we affirm the grant of summary judgment in favor of the university on this claim.

That leaves Gawley's two evidentiary issues: whether the district court properly excluded the testimony of her expert witness, and whether the court properly excluded her evidence of harassment against other women at the university by Minger and others. In light of our affirmance on grounds that cannot be cured by the evidence she proffers, these issues are moot, and we will not consider them further.

III.

For the reasons stated above, we affirm the district court's grant of summary judgment in favor of the university.

AFFIRMED.

FOOTNOTES

/1 We will assume for the purposes of summary judg-

ment that Minger made his weight-based harassing comments to women only; the university does not claim otherwise. We note this only because it is not immediately obvious that weight-based comments are sex discrimination.

/2 On July 16, 1995, she formally complained about the breast groping in a memorandum to Tammy Chappell.

/3 Neither party defines "IDACS" or "CAD." Construing the facts in favor of Gawley as we must at this stage of the proceedings, we assume McClain was requiring more training for Gawley than for other similarly situated officers and was threatening her with loss of her job if she did not comply with the additional requirements.

/4 The parties repeatedly refer to this as the tort of "spoilation" of evidence. We assume they mean spoliation of evidence, a term for which there is a body of law in Indiana.

/5 No affirmative defense is available when the supervisor's harassment culminates in a tangible employment action. Ellerth, 524 U.S. at 765.

/6 Title VII also seeks to make persons whole for injuries suffered on account of unlawful employment discrimination. Faragher, 524 U.S. at 805-06.

/7 Even if Minger were a mere co-employee, Gawley has failed to show any genuine issue of material fact regarding whether the university was negligent in preventing or correcting the harassment when it occurred. Employers are liable for a co-employee's harassment only when they have been negligent in discovering or remedying the harassment. See Parkins, 163 F.3d at 1035-38. Gawley concedes her delay in notifying the university about Minger's conduct, and also concedes the harassment stopped once she complained. Therefore her claim fails on this alternate ground that she asked us to consider.

/8 Of course, an employee is not required to file a separate EEOC charge alleging retaliation when the retaliation occurs in response to the filing of the original EEOC charge. See Aviles v. Cornell Forge Co., 183 F.3d 598, 603 (7th Cir. 1999).

/9 We wish to make clear that we are not ruling that the delay in issuance of the bullet proof vest is not severe enough conduct to cause a reasonable person to quit her job. Had Gawley properly preserved her claims, we might well have a different case. If an employee could show that the employer delayed the issuance of critical safety

equipment on the basis of gender or race, for example, the employee might have a cognizable claim.

/10 Gawley asks us to consider the rule of evidence that allows us to construe the missing documents against the university in considering her other claims. Even if we assume that the initial draft of the report was more critical of Minger and the university, and that the report was changed to favor the university, our conclusions do not change. Gawley's claims failed largely because she failed to avail herself of established procedures and because she failed to properly preserve her claims in her EEOC charges, not because she lacked evidence that Minger treated her deplorably.