# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1651

DONNA M. RHODES,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF TRANSPORTATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9040—**Ruben Castillo**, *Judge.*

———————

ARGUED NOVEMBER 6, 2003—DECIDED FEBRUARY 26, 2004

———————

Before CUDAHY, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.*    Rhodes filed this Title VII action alleging discrimination against her former employer, the Illinois Department of Transportation ("IDOT"). She appeals the district court's decision to grant IDOT's motion for summary judgment dismissing with prejudice her claims of sex discrimination, sexual harassment, and retaliation. We affirm.

## I.

Rhodes was employed by IDOT as a full-time, seasonal highway maintainer at the Arlington Heights Maintenance Yard ("Yard") for three winter seasons from 1996 through 1999. Other workers generally refer to seasonal highway maintainers as "snowbirds." As a snowbird, Rhodes' job duties included plowing roadways during and after snowstorms, patching potholes, trimming trees, washing and cleaning snow trucks, and general Yard maintenance.

The chain of command at the Yard where Rhodes worked includes the Technician position, the Lead Lead Worker, and the Lead Worker. Don Morrison and Jon Bondi alternated as the Lead Worker during Rhodes' tenure. Michael Poladian served as the Lead Lead Worker during all three of Rhodes' seasons. During Rhodes' first two seasons, John Nicholas was the Technician and Matt Mara took the Technician position during her third and final season. The Lead Lead Worker is in charge of employees, but the Technician had the ultimate responsibility for all employees at the Yard, including the Lead Lead Worker. The Technician and Lead Lead Worker are responsible for assembling crews and assigning tasks to employees. These positions are the top two jobs at the Yard, but neither the Technician nor Lead Lead Worker are authorized to hire, fire, transfer, promote, demote, or discipline employees. Instead, these decisions are made by the Department Administrative Services Manager, an off-site employee. If the Technician believes that an employee has violated Department policy, the Technician may issue a "Report of Rule Infraction" and recommend the imposition of sanctions to the Department Administrative Services Manager.

Approximately 32 full and part-time employees worked at the Yard, and Rhodes was the only female during her first two seasons. Rhodes did not experience any serious docu-

mented problems at work during her first two seasons, and her reviews at the end of both seasons indicated that she was meeting IDOT's expectations. However, during Rhodes' second season, Poladian received some complaints from motorists that her snow route was not sufficiently plowed or that plowing took too long. For these reasons, Poladian suggested to Mara that Rhodes should be assigned to a shorter route. Accordingly, at the beginning of Rhodes' third season, her route was changed to a shorter route. She met with Poladian to discuss her disagreement with this change. This meeting led to a verbal altercation in which Rhodes asked for her old route back. Poladian refused to reassign Rhodes to her old route. According to Rhodes, she then asked to speak to Mara about the matter, and Poladian "threatened to strangle her." Poladian denies that he made such a threat.

After the altercation with Poladian, Rhodes proceeded to speak to Mara about the changed route and also discussed Poladian's alleged threat. Mara asked Rhodes to put her allegations in writing so that he could investigate, but she refused. Regardless, Mara brought Rhodes' allegations to the attention of his superior, Les Aling. Aling was an off-site Operations Engineer for IDOT. After speaking with Aling, Rhodes still did not get her old route back. Morrison, the Lead Worker, testified that he did not have a problem with Rhodes' work and did not receive an answer when he asked Poladian why her route was changed.

Rhodes claims that after complaining about the route change, work conditions deteriorated for her at the Yard. She claims that Poladian called her names such as "bitch" and "cunt" after she complained about the route changes. She also claims that Poladian forced her to wash a truck in sub-zero temperatures, that he assigned her to work in the Yard instead of on a road crew for several days, and that he

ordered Morrison to prohibit her from driving the foreman's truck while other workers were patching potholes. Morrison testified that Poladian told him to not allow Rhodes to drive the foreman's truck, and that he was never told to prohibit anyone other than Rhodes from driving the truck. In addition, Rhodes submitted evidence that she was prohibited from riding in the foreman's truck.

Rhodes also alleges that pornographic magazines and movies were prevalent at the Yard. She claims to have found and removed a picture of a nude woman placed on her locker, and often removed cartoons of a sexual nature from the bulletin board. Lead Worker Morrison and Lead Worker Bondi, both of whom oversaw Rhodes' work at one time, confirm Rhodes' testimony that a TV and VCR were used to watch pornographic movies during her employment, and that they watched the movies and had seen Poladian watch as well. The record reveals that this TV and VCR were concealed in the mechanics' room of the Yard, and that when the TV and VCR were brought out, employees used lookouts to prevent women and outsiders from catching on. Morrison testified that pornographic magazines were present at the Yard during all three years of Rhodes' employment, and for several years prior. Bondi confirmed that the magazines were prevalent for 18 years at the Yard. Mara has testified that he confiscated the magazines whenever he saw them at the Yard. Rhodes never looked at or complained about the pornographic magazines and videos.

Rhodes' other allegations include the claim that Poladian accused Morrison of having "something going on" with her. In addition, Pete Caruso, the Yard mechanic, claims that he was told by Poladian to not fix the heat in Rhodes' truck. Finally, on the evening of her last day, Rhodes complains that she told Morrison, the Lead Worker, that she would be

absent in order to take the highway maintainer's test[1] in the morning, but was marked absent for failing to contact the Technician or Lead Lead Worker in compliance with IDOT policy. She admits that in spite of this, IDOT did not terminate her employment, but instead asked her to return as a snowbird for the 1999-2000 season and to interview for a permanent highway maintainer position, but she declined to return to work for IDOT any longer.

In response to Rhodes' allegations, IDOT emphasizes that it has a "zero tolerance" policy regarding harassment and discrimination. IDOT employs civil rights officers who conduct yearly training sessions and post civil rights materials in the Yard. On the one occasion that Rhodes reported to Poladian that she had found a pornographic picture taped to her locker, Mara and Poladian immediately had a meeting with Yard employees and told them that such conduct was not permitted. IDOT claims Rhodes was marked absent because she failed to contact the Lead Lead Worker or the Technician as required by IDOT policy.

The district court granted IDOT's motion for summary judgment on Rhodes' sex discrimination claim by finding that she had not presented any direct evidence of sexual discrimination, and that under the burden-shifting framework, she failed to establish the last two prongs of a prima facie case: an adverse employment action and that similarly situated persons were treated more favorably. Summary judgment was granted on her harassment claim because Mara and Poladian were found not to be supervisors for purposes of Title VII and IDOT was not negligent in failing to discover and remedy the harassment. As for Rhodes'

---

[1] This test was necessary for Rhodes to maintain her eligibility for employment with IDOT.

retaliation claim, the district court found that she flunked three out of the four elements required for a prima facie case because her complaints about the route change were not statutorily protected activity, she did not suffer an adverse employment action, and she was not treated less favorably than similarly situated male employees.

## II.

### A.  Sex Discrimination Claim

We review the district court's grant of summary judgment de novo, construing all facts in favor of Rhodes, the nonmoving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under Title VII of the Civil Rights Act of 1964, it is unlawful for employers with more than 15 employees "to discriminate against any individual with respect to his . . . conditions . . . of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove intentional employment discrimination under Title VII by using either the "direct method" or "indirect method*." See Cianci v. Pettibone Corp.*, 152 F.3d 723, 727-28 (7th Cir. 1998).

The direct method of proof permits a plaintiff to show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as sex. *Id.* at 727. Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part

of the employer without reliance on inference or presumption. *Rogers*, 320 F.3d at 753; *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). In short, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers*, 320 F.3d at 753 (citation omitted). A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

If a plaintiff cannot prevail under the direct method of proof, he must proceed under the indirect method, *i.e.*, the familiar *McDonnell Douglas* framework. *See Adams*, 324 F.3d at 939. Under that test, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination. *See Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). In order to establish a prima facie case, the plaintiff alleging sex discrimination must prove that: (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) he experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably. *Id*.

Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action. *See, e.g., Haugerud v. Amery School District*, 259 F.3d 678, 691 (7th Cir. 2001). A materially adverse em-

ployment action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty National Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits. *See, e.g.*, *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000).

Here, it is important to initially emphasize the undisputed evidence that Rhodes voluntarily decided to quit her job after being marked absent once. Rhodes does not allege any significant changes in her employment status, nor does she allege that she suffered a substantial change in benefits. Instead, her allegations of sex discrimination amount to: 1) having to wash her truck in cold weather; 2) being assigned to the Yard instead of a road crew for three days in April of 1999; 3) having to drive a truck without heat for a few days; 4) being prohibited from driving or riding in the foreman's truck; 5) the change in her route; and 6) being marked absent on her last day of work allegedly contrary to company policy.

Rhodes' allegations, if true, constitute mere temporary inconveniences and do not rise to the level of an adverse employment action. *See Halloway v. Milwaukee County*, 180 F.3d 820, 826-27 (7th Cir. 1999). Not everything that makes an employee unhappy qualifies as an adverse action for Title VII, *see Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), and this is particularly true since Rhodes primarily complains of assignments or tasks consistent with the job duties of a winter highway maintenance worker. The record indicates that other snowbirds were also transferred to different routes, and that Rhodes' new route was actually

shorter than her previous route. Rhodes' allegation that she was marked absent without pay does not qualify as a disciplinary suspension because this single absence had only a negligible impact on her income, and did not cause her material harm. *See Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996); *Traylor*, 295 F.3d at 789. Accordingly, the district court correctly granted IDOT's motion for summary judgment because Rhodes did not submit evidence of a materially adverse employment action within the meaning of Title VII.

## B. Sexual Harassment in the Form of a Hostile Work Environment Claim

To prevail on a claim of sexual harassment based on hostile work environment, a plaintiff must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). Proof of a hostile work environment requires evidence that the plaintiff was subjected to conduct "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002). To qualify as "hostile," the work environment must be "both objectively and subjectively offensive . . . ." *Hilt-Dyson*, 282 F.3d at 463.

Here, IDOT concedes that Rhodes was subjected to unwelcome, sexually-related conduct severe or pervasive enough to create a hostile work environment. The only question for review is whether the district court correctly

determined that she failed to establish a basis for em-
ployer liability. The standard for employer liability turns on
whether the alleged harasser was the plaintiff's supervisor,
instead of a mere co-worker. *See, e.g., Faragher v. City of
Raton*, 524 U.S. 775, 807-08 (1998); *Haugerud*, 259 F.3d at 696-
97. Harassment by a supervisor of the plaintiff triggers strict
liability, subject to the possibility of an affirmative defense
in the event the plaintiff suffered no tangible employment
action. *See Parkins v. Civil Constrs. of Ill, Inc.*, 163 F.3d 1027,
1032 (7th Cir. 1998). Conversely, an employer may be found
liable for a hostile work environment created by an em-
ployee who was not the plaintiff's supervisor only where
the plaintiff proves that the employer has "been negligent
either in discovering or remedying the harassment." *Id.*

The district court determined the alleged harassers to be
Mara and Poladian, and concluded that Rhodes failed to
submit competent evidence that these individuals had the
authority to make decisions affecting the terms and con-
ditions of her employment. In addition, the district court
determined that Rhodes could not establish that IDOT was
negligent either in discovering or remedying any harass-
ment committed by employees who were not supervisors of
Rhodes, and that the pornography at the Yard was not so
pervasive as to impute knowledge to IDOT. We examine
each of these conclusions.

We first consider the issue of supervisor harassment. For
there to be an issue of material fact as to whether a super-
visor harassed Rhodes, it is not enough that she point to
evidence that anyone with managerial authority engaged in
sexual harassment; instead Rhodes, as the victim of the
harassment, must show that the harasser served specifically
as *her* supervisor. *Id* at 1032-34. A supervisor is someone
with the power to *directly* affect the terms and conditions of
the plaintiff's employment. *Id.* at 1034; *Hall*, 276 F.3d at 355.

"Supervisor" is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context. *See Hall*, 276 F.3d at 355 ("[T]he fact that an employer authorized one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship."). *Hall* held that the plaintiff's harasser did not qualify as a supervisor despite the fact that he: (1) exercised authority to direct plaintiff's work operations; (2) provided input into her performance evaluations; and (3) was charged with training her and other less-experienced employees. *Id.*

Here, similar to the responsibilities of the harasser in *Hall*, Mara and Poladian managed Rhodes' work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations to the Department Administrative Services Manager. However, it is undisputed that neither Mara nor Poladian had authority to make any decisions affecting the terms and conditions of Rhodes' employment, *i.e.*, the authority to hire, fire, promote, demote, discipline or transfer Rhodes.[2]

Accordingly, since Rhodes cannot establish that Mara or Poladian exercised supervisory authority over her under Title VII, she is entitled to reach a jury only if she pointed to competent evidence that IDOT was negligent either in discovering or remedying the harassment directed at her.

---

[2] The district court focused generally on whether Mara or Poladian had the authority to alter the terms and conditions of employment for any employee at the Yard. The scope is narrower than that. The proper focus should examine whether Mara or Poladian were vested with the authority to alter the terms and conditions of Rhodes' specific employment. *See Parkins*, 163 F.3d at 1032.

*Hall*, 276 F.3d at 356. IDOT "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000). Generally, we do not consider an employer to be apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (internal quotation omitted). However, we could charge an employer with constructive notice where the harassment is sufficiently obvious. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046, n.8 (7th Cir. 2000); *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1018 (7th Cir. 1996). Regardless, as emphasized by the district court, "the law against sexual harassment is not self-enforcing." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997). Without employer knowledge of harassing conduct, the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII. *See Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 569 (7th Cir. 2001).

The district court determined that IDOT had an adequate anti-harassment policy in place, and that Rhodes' sole harassment-related complaint, arising from a pornographic photo taped to her locker, was addressed appropriately. Specifically, the IDOT policy identifies designated contact persons to accept complaints of discrimination or harassment. In addition, the names and phone numbers of these contact persons, along with civil rights newsletters and posters, are displayed in the Yard. After Rhodes complained about the pornographic photo taped to her locker, Mara and Poladian immediately called a meeting where they emphasized that such material was prohibited in the Yard due to the well-publicized "zero tolerance" anti-harassment policy.

Rhodes argues that IDOT should have been aware of the pornography in the workplace because such material was present for several years. In addition, she argues that the meetings called by Mara and Poladian to reinforce the IDOT anti-harassment policy were a sham because Poladian personally viewed the pornography. However, there is no evidence that Rhodes or anyone else complained about the pornographic magazines or movies. The record reveals that Mara, the highest-ranking IDOT employee at the Yard, discarded pornographic magazines any time he saw them. Moreover, there is no evidence that Mara watched any of the pornographic movies, or even knew that there was a TV and VCR at the Yard. Importantly, the men kept a "lookout" to alert them if a woman or outsider approached while they were viewing the movies. Accordingly, Rhodes has failed to set forth sufficient evidence that the harassment was so pervasive and obvious that IDOT must be charged with constructive knowledge as explained in *Mason* and *Zimmerman*. It is undisputed that Rhodes' single complaint of harassment raised with management addressed only the pornographic picture taped to her locker. We agree with the district court that this complaint does not impute knowledge to IDOT of the pornographic magazines and the existence of the television. Likewise, there is no evidence that this complaint even remotely pinpointed the myriad of other allegations of discrimination alleged in this lawsuit. *Cf. Hrobowski v. Worthington Steel Co.*, ___ F.3d ___ (7th Cir. 2004), 2004 WL 291973, at *4 (7th Cir. Feb. 17, 2004). Thus Rhodes' isolated complaint fails to establish that she made a concerted effort to inform IDOT that a problem exists as required in *Silk*. Rhodes failed to take advantage of the preventative or corrective opportunities provided by IDOT and thus her hostile environment claim fails without reaching a jury because she has not pointed to adequate evidence showing that IDOT was negligent in discovering or remedying the harassment.

### C.  Retaliation Claim

Finally, Rhodes claims that IDOT retaliated against her by marking her absent without pay, in violation of company policy, on what turned out to be her final day of employment. Title VII prohibits an employer from discriminating against an employee because that employee has opposed any practice deemed unlawful under the Act. 42 U.S.C. § 2000e-3(a). The plaintiff may establish a prima facie case of retaliation and overcome defendant's motion for summary judgment using either the direct method or the indirect method. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F. 3d 640, 642 (7th Cir. 2002). Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.* at 644.

Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003). "Under this method, the 'plaintiff so proceeding need not show even an attenuated causal link.' " *Haywood, id.* (internal citation omitted). If the plaintiff establishes these elements, the burden of production shifts to the defendant to come forward with a legitimate, noninvidious reason for its adverse action. *Id.* Although the burden of production shifts to the defendant under this method, "the burden of persuasion rests at all times on the plaintiff." *Haywood*, 323 F.3d at 531 (citing *Klein v. Trustees of Indiana*

*Univ.*, 766 F.2d 275, 280 (7th Cir. 1985)). Once the defendant presents a legitimate, non-invidious reason for the adverse action, the burden remains with the plaintiff to present evidence that the defendant's reason is pretextual. *Id.*

It is unclear whether Rhodes engaged in protected activity because she failed to comply with IDOT's request to formally complain in writing. *Cf. Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (holding that the plaintiff employee's informal complaints did not constitute protected activity until she complained through the formal channels of the city's complaint mechanism). However, we need not resolve this and other issues because Rhodes' complaint that she was marked absent in violation of IDOT policy, on what turned out to be her last day of work, occurred after Rhodes failed to follow Lead Worker Morrison's instruction to tell either the Lead Lead Worker or the Technician that she would be absent that day. Although there appears to be a dispute as to whether the written workplace rules required Rhodes to inform the Lead Lead Worker of her absence, as IDOT claims, the fact that Morrison instructed her to tell either Mara or Poladian about the absence is undisputed. We find nothing unreasonable in that instruction, nor do we perceive that Rhodes had any excuse not to comply. Her failure to notify Mara or Poladian per Morrison's instruction therefore constitutes a legitimate, non-pretextual reason for marking her absent without pay.

### III.

The district court correctly granted summary judgment on Rhodes' sex discrimination claim under Title VII because she failed to set forth a materially adverse employment action under either the direct or indirect method of proof.

The district court also correctly granted summary judgment on Rhodes' hostile environment claim. She did not establish a basis for employer liability because her alleged harassers were not her supervisors under Title VII, and she failed to offer adequate evidence that IDOT was negligent in discovering or remedying the harassment. Finally, summary judgment was appropriately entered on her retaliation claim because IDOT had a legitimate, non-pretextual reason for marking her absent without pay. We therefore AFFIRM the district court.

ROVNER, *Circuit Judge*, concurring in part and concurring in the judgment.  Given the undisputed facts and the law of this circuit, I agree that IDOT is entitled to summary judgment on each of Rhodes' claims, and I join Parts I, II.A., and II.C. of the majority's opinion. I write separately to express my concern about this circuit's method of identifying supervisors who may render the employer strictly liable for sexual harassment occurring in the workplace, *see ante* at 10-11.

Consistent with this Court's opinions in *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002), and *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998), we reiterate today that an employee must have the authority to directly affect the terms and conditions of the plaintiff's employment in order to qualify as a supervisor and render the employer vicariously liable for the employee's harassing

conduct. *Ante* at 10-11. The authority to oversee the plaintiff's work is not deemed sufficient to meet that test. *Id.*, citing *Hall* at 355. Thus, although Mara and Poladian managed Rhodes' work assignments, investigated complaints and disputes, and recommended sanctions for violations of workplace rules, the court concludes that this authority is insufficient to make them supervisors.

Although this holding represents a faithful application of *Hall* and *Parkins*, other courts have criticized the supervisory standard articulated in *Hall* and *Parkins* as too narrow. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 126-27 (2d Cir.), *cert. denied*, 124 S. Ct. 562 (2003); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001); *Entrot v. BASF Corp.*, 819 A.2d 447, 459 (N.J. Super. Ct. App. Div. 2003). The Equal Employment Opportunity Commission as well has indicated that an individual may qualify as a supervisor not only when he has the power to hire, fire, promote, demote or reassign the plaintiff employee, but also when he "has authority to direct the employee's daily work activities." *EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors*, No. 915.002, § III.A. (June 18, 1999); *see id.* § III.A.2.

Insistence that the harasser have the power to take such formal employment actions as hiring, firing, or demotion before he will be treated as a supervisor strikes me as a particularly narrow view, and potentially a troubling one in a case like this. Mara and Poladian held the top two positions at Rhodes' workplace. Although they did not have the power to take formal employment actions vis-à-vis Rhodes, they necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work—certainly more familiar with it than the off-site Department Administrative Services Manager. Indeed, Mara and Poladian were the ones responsible for Rhodes'

day-to-day assignments and work environment. Viewing the facts favorably to Rhodes, Mara and Poladian essentially ran the Arlington Heights Maintenance Yard on IDOT's behalf. They were superior not just to her, but to everyone else at that worksite as well. Consequently, whatever formal employment authority they lacked, a factfinder reasonably might conclude that the power IDOT had given them to manage the Yard on a day-to-day basis enabled or facilitated their ability to create a hostile work environment for Rhodes. *See Mack*, 326 F.3d at 126; *see also Gawley v. Indiana Univ.*, 276 F.3d 301, 310-11 (7th Cir. 2001).

Cases like this one suggest that we ought to re-examine the criteria we have articulated for identifying supervisors. The standard that this circuit has established has the allure of drawing a bright line between those who have the power to make formal employment decisions and those who do not. But it excludes from the category of supervisor those employees who, although lacking final authority to hire, fire, promote, demote, or transfer the plaintiff, nonetheless enjoy substantial authority over the plaintiff's day-to-day work life. To that extent, it is a standard that arguably does not comport with the realities of the workplace. And to the extent that employers with multiple worksites vest the managers of such sites with substantial authority and discretion to run them but reserve formal employment authority to a few individuals at central headquarters, our standard may have the practical, if unintended, effect of insulating employers from liability for harassment perpetrated by their managers.

CUDAHY, *Circuit Judge*, concurring. I join Judge Rovner's special concurrence to the extent that it suggests the reconsideration and broadening of this circuit's announced criteria for identifying supervisors. This, of course, does not affect the outcome or rationale of the majority opinion.


A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*