# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-2310 & 04-2365

DORIS ISBELL and JAMES SCHNEIDER,

*Plaintiffs-Appellants,*

v.

ALLSTATE INSURANCE COMPANY,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 01 C 252 & 01 C 655—**David R. Herndon**, *Judge.*

_____

ARGUED JANUARY 19, 2005—DECIDED AUGUST 15, 2005

_____

Before CUDAHY, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Doris Isbell and James Schneider are former employees of Allstate Insurance Company ("Allstate" or, the "Company"). After Allstate reorganized its workforce and abolished their positions with the company, the two sued Allstate in the United States District Court for the Southern District of Illinois. The suit alleged (among other things) claims of discrimination and retaliatory discharge. The district court granted summary

judgment in favor of Allstate with respect to all of these claims, and in favor of Schneider with respect to Allstate's assertion of damages for its claim of breach of a contract by Schneider. We affirm the district court's summary judgment in favor of Allstate on Isbell's claims. We also hold, however, that Schneider did not breach his contract with Allstate and thus reverse the district court's grant of summary judgment in favor of Allstate on that claim.

## I.

In November 1999, Allstate announced a company-wide plan to change the nature of its business relationship with a significant number of the people who sold insurance for it. The basic idea was that Allstate would no longer sell insurance through employees, known here as "employee agents," but would do so instead through a network of exclusive independent contractors.[1] To accomplish this conversion, the company decided to terminate, effective June 30, 2000, all of its approximately 6,400 employee agents—regardless of age, productivity, or performance.

---

[1] The actual division of Allstate's sales force prior to the reorganization was somewhat more complicated than we have presented it here. There were, apparently, six types of contractual relationships between Allstate and its sales force (Schneider and Isbell each had a different class of contract with Allstate). In fact, one of the reasons Allstate cites for its reorganization decision was to cut down on the costs of administering these diverse relationships.

For our purposes, however, it is sufficient to say that prior to the reorganization there were two broad categories of insurance salespersons for the Company: independent contractors and employee agents. The goal of the reorganization was to make all of the Company's sales force independent contractors.

Allstate did not, necessarily, seek to completely end its relationship with the terminated employee agents. Allstate offered each of the 6,400 employee agents, including Isbell and Schneider, four options. The first two of these options allowed an employee to enter into an independent contractor relationship with Allstate. Both options would grant the new contractors the opportunity to have an economic interest in the book of business they wrote for the company as well as certain other benefits, including a $5,000 bonus and the forgiveness of certain office expense advancements. The first option ("Option One) envisioned a long-term relationship with the new contractor and the Company, while the second option ("Option Two") foresaw a transitory relationship between the contractor and the Company—the expectation was that the new contractor would sell his or her book of business to an approved buyer (presumably another Allstate contractor) and then leave the Company. The third option ("Option Three") was that the employee could terminate its relationship with Allstate and receive a year's pay as severance. The fourth option ("Option Four") also included an immediate end to the parties' business relationship and a simple severance pay-out for up to thirteen weeks' salary.

The first three options offered by Allstate required the terminated employee to sign a release (the "Release") that purported to waive any claim that an employee might have against Allstate under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (the "ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, (the "ADA"), and the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1140 *et seq.* ("ERISA"). The Fourth Option did not require the terminated employee to sign the Release. Thus, the key

difference between Options Three and Four was that in order to receive a year's severance pay an employee had to sign the Release. If an employee refused to sign the Release he was entitled to the much briefer period of severance but retained the right to bring suit against Allstate for any claims he might have under the aforementioned statutes.

Allstate gave each affected employee (including Isbell and Schneider) a copy of the Release and information explaining the implications of signing (and not signing) the Release. Allstate also encouraged each employee to consult an attorney before signing the Release.

Isbell and Schneider were both informed of the termination decision in an employee meeting held by Allstate in Collinsville, Illinois sometime in November or December 1999 (the record is not clear as to precisely when, but there is no doubt that the two knew of their pending termination no later than December 1999). In the meeting, employees were told they would be fired in approximately six months and the four options set forth above were explained. Isbell and Schneider have both admitted that they knew that their particular terminations were part of this program, that they were not singled out for termination, and that they would be terminated from their current positions regardless of whether they signed the Release.

Schneider signed the Release and chose Option Two after meeting with an attorney who actually recommended that Schneider *not* sign the release. By taking Option Two, Schneider was given an economic interest in his book of business which he subsequently sold to another Allstate contractor for $120,000. Schneider also was given the $5,000 bonus and was forgiven a $1,000 debt with the company. Schneider admits that Allstate complied with its end of the bargain in all respects. Nevertheless, on December 14, 2000, Schneider filed an EEOC charge alleging age discrimination and retaliation.

Isbell did not sign the Release. At first, she was inclined to remain with the company as an independent contractor but did not want to have to do so at the cost of signing the Release. Because this was not possible she chose to leave the Company. Allstate paid her the severance she was entitled to under Option Four. Before she left, however, in May 2000, she filed a claim of age discrimination and retaliation with the EEOC.

Isbell and Schneider ultimately filed the present suit. Both made claims of retaliation in violation of the ADEA, Title VII, the ADA, and ERISA, discrimination in violation of the ADEA, and unlawful termination to prevent the use of pension benefits—an ERISA claim. Isbell also raised a claim of retaliation in violation of state law. Allstate filed a counterclaim against Schneider (but not Isbell) for breach of contract (the Release) and unjust enrichment. The district court consolidated the cases and the parties conducted discovery.

On February 19, 2002, Isbell moved for partial summary judgment on her claims of retaliation. Allstate filed a cross-motion for summary judgment in its favor. The district court ultimately denied Isbell's motion and granted Allstate's.

At the conclusion of discovery Allstate moved for summary judgment on the remainder of Isbell's claims, all of Schneider's claims, and its counterclaim against Schneider. On November 25, 2003, the district court granted Allstate's motion as to Schneider's breach of the Release. The district court ultimately ruled in favor of Schneider with respect to damages, finding that, although Schneider had breached his contract with Allstate, Allstate had shown no damages from the breach.

After the district court entered a final judgment, Isbell filed this appeal from the district court's entry of judgment

on her retaliation, discrimination, and ERISA claims while Allstate has appealed the district court's denial of damages in its counterclaim against Schneider. Schneider has not appealed the decision denying his claims and he is a party to this appeal only as a cross-appellee in Allstate's appeal.

## II.

As we have just noted, Isbell and Allstate each appeal adverse rulings by the district court. We discuss each in turn.

### A.  Isbell's Appeal

Isbell appeals the district court's decisions to grant summary judgment in favor of Allstate on her claims of retaliation, discrimination, and violation of § 510 of ERISA. We review a district court's grant of summary judgment de novo. *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 831 (7th Cir. 2005). "[S]ummary judgment is only appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed. R. Civ. P. 56(c)).

### 1.  Isbell's retaliation claim.

As with other employment-related claims (discrimination for instance), a plaintiff may proceed with a claim of retaliation pursuant to either the direct or indirect method. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). In this case, however, because Isbell has offered no evidence of retaliation under the direct method, we proceed to the

indirect method. This method requires Isbell to show: "(1) she engaged in statutorily protected activity; (2) she was performing her job according to [Allstate's] legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.*

Given the standard we have just recited, Isbell appears to throw in the towel when she admits in her opening brief to this court that "her employment was [not] terminated in retaliation for protected activity." Instead, Isbell advances a novel theory of retaliation, claiming that Allstate retaliated against her when it refused her "the opportunity to work for Allstate albeit under a different contract unless she signed the release." Isbell thus argues that Allstate could not require her to sign the Release as a condition to becoming an independent contractor with the Company.

Isbell was not a victim of retaliation. Her reason for termination was the same for all employees at Allstate who were similarly situated. She had four options. Three of those options had various incentives and benefits in exchange for the release. In order to be valid, a release, like all agreements, must be supported by consideration. *See, e.g.*, 29 U.S.C. § 626(f)(1)(D) (stating that for a release to be valid under the Older Workers Benefits Protection Act, a release must be supported by consideration). An employee who refuses to sign a release will not be offered the same deal as a terminated employee who is willing to sign the release.

It is also clear that Isbell did not lose her job, because she refused to sign the Release. She lost her job for the same reason 6,400 other employee agents of Allstate lost theirs, *including those who signed the Release*—because Allstate had decided to eliminate all employee agent positions with the Company. Isbell's fellow plaintiff Schneider signed the

Release, yet he too lost his job as an employee agent. The district court did not err in granting summary judgment in Allstate's favor on Isbell's claim of retaliation.

### 2.   *Isbell's ADEA discrimination claim.*

Pursuant to the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Like other similar claims, a plaintiff raising a claim of age discrimination may proceed by either the direct or indirect method. *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003). Isbell has chosen the direct method.

A plaintiff utilizing the direct method may rely on either direct or circumstantial evidence. *Rhodes*, 359 F.3d at 504. As this court has noted, direct evidence of age discrimination (or any other form of discrimination for that matter) essentially requires an admission by an employer or some sort of "smoking gun" that points to discrimination. *Jordan*, 396 F.3d at 832; *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir. 1997). There was no such admission or smoking gun here.

Circumstantial evidence under the direct method is sufficient to show discriminatory intent only where the plaintiff can "construct[ ] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.' " *Rhodes*, 359 F.3d at 504 (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). The evidence must, however, "point directly to a discriminatory reason for the employer's action." *Id.*

(quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Isbell presents evidence from a series of studies conducted by Allstate, or on its behalf by consultants, that Isbell claims show that the Company believed younger agents performed better than older agents. The first study cited by Isbell was conducted by the Company in mid-1996, three and one-half years prior to the revamping of Allstate's workforce. The results of that study were compiled in a Powerpoint[2] presentation and shared with the Allstate's then-Chairman/CEO and its COO. The primary focus of the study and the ultimate conclusion appears to be that independent contractors outperformed employee agents; a conclusion that appears to foreshadow Allstate's ultimate decision to eliminate the employee-agent position and move to an all-independent contractor model of business.

The presentation did note, however, some information concerning the age of agents which Isbell considers evidence of an intent to discriminate. The study showed the distribution of agents by tenure and average age and also noted that over 15% of the Company's agent force could retire in the next fifteen years. The study also suggested that "[t]here is a potential generational mismatch between our agents and the new customers we seek." It noted that "[p]roductivity declines slightly by the age of the agent." The study also found, however, that "[p]roduction by agent type remains constant, no matter what the agent age cohort." In other

---

[2] Powerpoint is a computer program that allows for the construction of "slide shows," often using graphics and other devices (tables, charts, etc.) to present a report in summary fashion. The slide shows can be printed out and distributed on paper, displayed on a computer, or projected onto a screen (as in a board meeting).

words, independent contractors had approximately the same production level regardless of the age grouping—thirty to thirty-nine-year-old independent contractors had the same production level as forty-five to forty-nine year-old independent contractors and likewise for employee agents.[3]

The second study relied on by Isbell was a study, known as the Sale Organization of the Future (the "SOOF"), prepared for the Company in 1997 by an outside consultant. The SOOF study was much more concerned with the age of the Company's employee agents than the 1996 study. The SOOF included a presentation of agent demographics that highlighted the age distribution of the Company's agents and explored the options for eliminating the employee-agent role in the agent workforce.

Isbell also cites a 1999 study conducted by Allstate that studied the relationship between age and productivity. Although Isbell reports that the study showed that agents in younger age groups produced "slightly more new busi-

---

[3] Without too much analysis (we are not privy to the underlying data that went into these studies), this would suggest a fairly innocuous reason for the statement that production for agents declined slightly by the age of an agent. The independent contractors outperformed their employee-agent counterparts and the independent contractor program was concentrated amongst the relatively younger employees (the program was relatively new in 1996). Thus, the decline in production numbers for all agents as they aged could be attributable to the concentration of the better performing agent types in the younger age groups. Thus, while a forty-nine year-old agent, on average, could be expected to perform as well as a thirty-year-old agent of the same type, there were more agents from the poorer performing agent types in the higher age brackets than there were better performing agent types.

ness," Isbell failed to note the heading to that page of the study—"[o]verall, there is a *weak* relationship between age and production." (Emphasis added.) Isbell also failed to note that the study concluded that "focusing only on 'high potential' hires, there is little relationship between age and production." Finally, Isbell failed to cite a conclusion of the study "age should not play a role in recruiting or hiring decisions."

Taken together, this evidence does not provide a "convincing mosaic" from which a jury could infer discriminatory intent on the part of Allstate. As the district court pointed out, there was no evidence that the studies were used by the decisionmakers involved in the decision to eliminate the employee-agent program. *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403-04 (7th Cir. 1996).

Isbell's claim that Allstate discriminated against older workers when it eliminated the employee-agent position has no merit. She seeks to magnify the age issue by focusing only on one job category without recognizing the entirety of Allstate's restructuring effort—eliminating an employment position *and* offering those affected another position with the Company. As a consequence, every employee in that position lost his job, *regardless of age*.[4] That was not the sum of Allstate's restructuring program, however. Each and

---

[4] This is also the reason Isbell cannot succeed in showing discrimination via the indirect *McDonnell Douglas* method. That method requires Isbell to show (among other things) that similarly situated persons under forty were treated better than she was. That is not possible here. Every person similarly situated to Isbell, over forty or under forty, was treated precisely the same way—their position with the Company was terminated and they were offered a choice of options including a new position with Allstate.

every one of the employee agents, *regardless of age*, was offered a new opportunity with the Company. Allstate was entitled to summary judgment on Isbell's claim of age discrimination.

### 3.   Isbell's ERISA claim.

Isbell claims that Allstate violated § 510 of ERISA when it eliminated her position because it did so, according to Isbell, for the purpose of preventing her from taking advantage of vested health benefits. Section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . ." 29 U.S.C. § 1140.

The loss of benefits to an employee as a result of an employer's action is not, by itself, sufficient to prove a violation of § 510. The employer must have the specific intent to deprive an employee of his plan rights. *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998). No violation will arise where the deprivation was simply the consequence of a decision that had the incidental effect of affecting an employee's benefits. *Id.* (quoting *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991)). "[T]he plaintiff must ultimately show that a desire to frustrate attainment or enjoyment of benefit rights contributed toward the employer's decision and can avoid summary judgment only if the materials properly before the district court, construed sympathetically, allow for such a conclusion." *Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994).

As above, a plaintiff can show a violation of § 510 pursuant to the direct or indirect method. Isbell has no direct or circumstantial evidence that Allstate eliminated the em-

ployee-agent position for the purpose of depriving her (and the other employee agents) of her pension and health care benefits. She must proceed, therefore, under the indirect method. Such method utilizes the *McDonnell Douglas* burden-shifting analysis.

A plaintiff makes out a prima facie under § 510 where she can show "that [she] (1) belongs to the protected class; (2) was qualified for [her] job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate" or to prevent the use of benefits was present. *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir. 1996); *Lindemann*, 141 F.3d at 295. In a § 510 case, however, this court need not "determine whether a plaintiff has established a prima facie case where a defendant has advanced a legitimate, nondiscriminatory reason for its action." *Id.* at 296.

In this case Allstate has offered legitimate, nondiscriminatory reasons for eliminating the employee-agent position and moving to an all-independent contractor agent force. Chief among these was the higher productivity of independent contractors (and, notably, the even higher productivity for former employee agents who had voluntarily converted to independent contractors). The independent contractors were paid higher commissions than employee agents and no doubt, like many companies, Allstate believed that paying its sales force primarily through commissions spurs the salesmen to sell more. This is a legitimate business reason for Allstate's decision. Allstate was entitled to summary judgment.

## B.  Allstate's Appeal

Allstate appeals the district court's conclusion that while Schneider had breached his agreement with the Company

(the Release), Allstate was not entitled to damages arising from that breach. Schneider wanted to have his cake and eat it too. In spite of his signing the Release he sued under the ADEA. In the meantime, he took full advantage of Option Two by selling his book and retaining the bonus (and the benefit of the forgiven loan). Allstate claims damages in the amount of $126,000: $120,000 for the economic interest in his book of business Schneider was able to sell; $5,000 for the bonus he was given for signing the Release; and $1,000 for the forgiveness of an advance Allstate had given him. Allstate does not seek attorney's fees.

The Release signed by Schneider provided that the employee "hereby release[s], waive[s], and forever discharge[s] Allstate . . . from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, . . . including . . . any claim for age or other types of discrmination prohibited under the [ADEA, Title VII, the ADA, and ERISA]." Allstate and the district court consider the Release a covenant not to sue and consequently, Allstate argues Schneider breached the covenant when he sued Allstate.

We disagree. The Release does not amount to a covenant not to sue, but rather is a release from liability for any potential past claims. While the Release gives Allstate a defense that prevents Schneider from winning, the Release does not contain plain language that amounts to an agreement not to sue. As the Eighth Circuit recently noted, "[a] release of claims and a covenant not to sue serve different purposes." *Thomforde v. Int'l Bus. Machs. Corp.*, 406 F.3d 500,

503 (8th Cir. 2005).[5] The latter does not result in breach upon the filing of a suit. Instead, it provides Allstate with an effective affirmative defense should a claim be raised. Because the Release was a release of claims and not a covenant not to sue, Schneider did not breach the Release with his suit. Allstate received the benefit of its bargain— an affirmative defense.[6] Summary judgment should have been granted in favor of Schneider on Allstate's claim of breach.

## III.

Allstate eliminated the positions of 6,400 employees, regardless of their age. It then turned around and offered

---

[5]  In *Thomforde*, an engineer was fired as part of a reduction in force and signed a document titled "General Release and Covenant Not to Sue." *Thomforde*, 406 F.3d at 501. Similar to the Release in this case, that agreement contained a provision releasing IBM from claims arising under the ADEA. *Id.* The IBM agreement, however, went on to include another paragraph stating that "[y]ou agree that you will never institute a claim of any kind against IBM . . . including, but not limited to, claims related to your employment with IBM or the termination of that employment . . . ." *Id.* at 501-02. The court and the parties considered the first provision a release and the second a covenant not to sue.

[6]  This does not mean, of course, that a party that is the beneficiary of release of liability is without all remedies—a party that brings a suit invoking claims covered by a release may be doing so in bad faith (and subject to paying the attorneys' fees of the party covered by the release). In this case, however, Allstate admits that it did not distinguish between the cost of litigating Isbell's claim (which was not subject to a release of liability) and Schneider's claim.

those same employees, regardless of age, new opportunities with the Company. This was not discrimination and Allstate did not retaliate against Isbell when it refused to hire her for one of these new opportunities after she refused to sign a release of liability. The district court did not err in granting Allstate summary judgment on Isbell's claims of retaliation and discrimination as well as Isbell's ERISA claim.

The district court erred, however, insofar as it granted summary judgment to Allstate on its counterclaim of breach of contract by Schneider. The decision of the district court to that effect is, therefore, REVERSED and it is ordered to enter judgment on that claim in favor of Schneider.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*