# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1890

HENRY FEINBERG, *et al.*,

*Plaintiffs-Appellants*,

*v.*

RM ACQUISITION, LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 659—**Wayne R. Andersen**, *Judge*.

ARGUED OCTOBER 26, 2010—DECIDED JANUARY 6, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal from the dismissal of a suit under ERISA requires us to consider the rights of participants in a retirement plan when the plan's sponsor sells all the assets out of which plan benefits might be paid and distributes the proceeds of the sale, thereby becoming a shell, but the buyer does not assume any of the seller's liabilities under the plan. Such cases are rare because retirement plans ordinarily must be funded, and

a funded plan either would be transferred to the new company or would remain with the old company (with the plan's funds intact), or would be terminated and the funds distributed to the participants. But the plan in this case—the Rand McNally & Company Supplemental Pension Plan—is what is called a "top hat" plan. Created in order to provide senior executives with deferred compensation (benefits on top of those provided by the company's basic pension plan), *In re New Valley Corp.*, 89 F.3d 143, 148-49 (3d Cir. 1996); Sally Lerner Galati, Note, "The ERISA Hokey-Pokey: You Put Your Top Hat In, You Put Your Top Hat Out," 5 *Nev. L.J.* 587, 589-93 (2005), top hat plans are unfunded. See 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). The plan designated the company as the plan administrator. The plaintiffs are former senior executives of Rand McNally & Company who were participants in the plan. For simplicity we'll pretend that the first listed plaintiff, Feinberg, is the only one.

Rand McNally declared bankruptcy in 2003. We have not been vouchsafed the details, but we do know that the final decree in the bankruptcy proceeding left the top hat plan "unimpaired," meaning simply that no part of the debt created by the plan had been discharged or modified in the bankruptcy proceeding.

In 2007, several years after emerging from bankruptcy, Rand McNally sold all its assets to RM Acquisition, LLC, a company that had been created by a private-equity firm. The contract of sale provided that RM would acquire, along with Rand McNally's assets, some but

not all of its liabilities. Among the liabilities not acquired were those of the top hat plan. After the sale, Rand McNally had no assets (presumably the sale proceeds went either to creditors or, in the form of a dividend, to the company's shareholders, but the record is silent on the matter), so could not continue paying benefits.

Feinberg sued Rand McNally, and the plan itself, along with RM. But when he discovered that Rand McNally, though it had never been dissolved, had no assets, he dropped it from the suit, along with the plan, also not dissolved but also assetless (for remember that it was an unfunded plan, so that the only assets out of which benefits could have been paid were assets of Rand McNally, which no longer had any). The district court granted RM's motion to dismiss the suit for failure to state a claim.

Feinberg argues that RM is liable to him for the benefits promised by the plan because it is (he contends) the "de facto plan administrator." The de jure administrator it is not. Although the plan designates as administrator not only Rand McNally but also "any successor to [Rand McNally] by reason of merger, consolidation, the purchase of all or substantially all of [Rand McNally's] assets, or otherwise," the successor would have to consent, as by taking over the plan without rejecting the successorship clause; RM did not consent, implicitly or otherwise.

The proper defendant in a suit for benefits under an ERISA plan is, in any event, normally the plan itself, see ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*,

378 F.3d 669, 674 (7th Cir. 2004), rather than the plan administrator, because the plan is the obligor. To sue the administrator for plan benefits is like suing a corporation's CEO to collect a corporate debt. And the plan in this case, though, as we said, it is assetless, like Rand McNally, has not been formally terminated and probably cannot be, because the benefits that it promised vested when the executives continued working for Rand McNally long enough to qualify. *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287-88 (3d Cir. 1995). But when the lines between the plan, the plan administrator, and the plan sponsor are indistinct or contested, the plaintiff's designation of the "wrong" defendant can be forgiven provided the "right" defendant is not misled. See *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610-11 (7th Cir. 2007); *Mein v. Carus*, 241 F.3d 581, 584-85 (7th Cir. 2001); *Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 349-50 (5th Cir. 2003). Recall that the plan's successorship provision designates the purchaser of all of Rand McNally's assets—which is RM—as the plan administrator. With the plan and its sponsor/administrator all empty eggshells, Feinberg had, in any event, no practical alternative to suing RM.

RM is Rand McNally's successor in the sense of having become the owner of Rand McNally's assets. But the purchase of a company's assets, even all of them, does not in itself make the purchaser the "owner" of the seller's liabilities. *Gray v. Mundelein College*, 695 N.E.2d 1379, 1388-89 (Ill. App. 1998); *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005) (applying Illinois law); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439

(7th Cir. 1977); *Kaiser Foundation Health Plan v. Clary & Moore, P.C.*, 123 F.3d 201, 204-05 (4th Cir. 1997); *Oppenheimer v. Prudential Securities Inc.*, 94 F.3d 189, 193 (5th Cir. 1996). You can purchase all the assets of a company and explicitly decline to assume *any* of its liabilities, and your declination will be valid unless the transaction is a fraud against creditors or the selling and the purchasing company aren't meaningfully separate, as in a corporate reorganization. Eg., *Gray v. Mundelein College, supra*, 695 N.E.2d at 1388-89; *Leannais v. Cincinnati, Inc., supra*, 565 F.2d at 439.

RM did not assume the top hat plan's liabilities; nor, so far as appears, did it connive with Rand McNally to deprive participants of their top hat benefits; nor was it (again so far as appears) a mere continuation of Rand McNally under another name. So Feinberg has not made a case for successor liability—at least under the conventional common law principles of successorship liability summarized above. A complication is that "when a claim arising from a violation of federal rights is involved, the courts allow the plaintiff to go against the purchaser of the violator's business even if it is a true sale . . ., provided that two conditions are satisfied. The first is that the successor had notice of the claim before the acquisition . . . . The second condition is that there be substantial continuity in the operation of the business before and after the sale, and is satisfied if no major changes are made in that operation." *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 747-48 (7th Cir. 1994); see also *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182-85 and n. 5 (1973); *Upholsterers' Int'l Union Pension Fund v. Artistic*

*Furniture of Pontiac,* 920 F.2d 1323, 1325-29 (7th Cir. 1990); *Trustees for Alaska Laborers-Construction Industry Health & Security Fund v. Ferrell,* 812 F.2d 512, 515-16 (9th Cir. 1987). This expands the common law rule for the sake of beneficiaries of federal statutes relating mainly to labor, including pensioners; the common law rule looks only to identity of ownership between seller and buyer and not to identity of operations between a seller and a buyer that may have been dealing at arm's length. But the federal rule cannot help Feinberg without a showing that "no major changes [were] made in [the] operation" of Rand McNally's business after the sale to RM. He has attempted no such showing.

So his claim against RM under section 502 (nonpayment of ERISA benefits) fails. There may conceivably have been a fraud but if so it is likely to have been committed by Rand McNally rather than by RM. Suppose Rand McNally distributed to its shareholders, in the form of a dividend, all the money it received from the sale of its assets to RM. Because a dividend is not an exchange for reasonably equivalent value, that would be a fraud by Rand McNally on its creditors, including the participants in Rand McNally's top hat plan, and the participants could seek redress against the shareholders under state law. 740 ILCS 160/1 *et seq.*; *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079-81 (7th Cir. 1997) (applying Illinois law); *Boyer v. Crown Stock Distribution, Inc.,* 587 F.3d 787, 792 (7th Cir. 2009). The suit if successful would generate funds out of which to pay in whole or part any judgment that the participants had obtained against Rand McNally for

defrauding them. But Feinberg hasn't followed that route—he's obtained no judgment against Rand McNally, and indeed has dropped it as a defendant—and we don't even know whether Rand McNally had any assets to distribute to its shareholders when it was sold to RM.

But Feinberg argues that RM is liable to him not only under section 502—the argument we've just rejected—but also under section 510 of ERISA. That provision is captioned "Interference with protected rights" and makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary [in an ERISA plan] for exercising any right to which he is entitled [under the provisions of his plan or under ERISA] . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.

RM argues that this provision kicks in only when an employer fires an employee or takes some other action deliberately to alter the employment relation in a way that impairs the employee's rights under the ERISA plan. Language in some cases supports this narrow interpretation, which limits the provision to alterations in the employment relationship. *McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665, 667-70 (7th Cir. 1993); *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127-28 (7th Cir. 1990); *Becker v. Mack Trucks, Inc.*, 281 F.3d 372, 381-83 (3d Cir. 2002); *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1461-62 (10th Cir. 1991). But that language is dictum. All that the cases *hold* is that terminating a

plan or modifying its terms does not, in and of itself, violate section 510. The cases use alteration of the employment relationship to illustrate what section 510 *does* forbid, and point out that words like "discharge," "fine," and "discipline" refer to what an employer does to an employee rather than to what a plan administrator does to a plan.

There is more to the statute. Not only do the words "suspend," "expel," and "discriminate" denote actions that can be taken against a participant or beneficiary who is not an employee, but many participants and beneficiaries are not employees; for example, many participants are retired or former employees—Feinberg is a former employee—and a plan beneficiary is normally a member of a participant's family rather than one of the participant's fellow employees. "[A] widow might inherit shares in a closely-held corporation, and be discriminated against, among all shareholders, in the payment of dividends. A university might deny admission to the beneficiary of a deceased employee because the applicant insisted on receiving death benefits due. A company might decide not to repay money lent to it by a deceased officer. A beneficiary who inherited a participant's intellectual property rights might not receive licensing payments due thereunder." *Mattei v. Mattei*, 126 F.3d 794, 807 n. 12 (6th Cir. 1997); see also *Heimann v. National Elevator Industry Pension Fund*, 187 F.3d 493, 504-08 (5th Cir. 1999). Such cases fit the statutory language. They are examples of interfering with a participant's rights without terminating or modifying an ERISA plan.

That isn't this case, however. RM wasn't trying to interfere with any rights that the plaintiffs may have had under the top hat plan. RM had nothing to do with the plan. Suppose you bought a $250 lawnmower from a hardware store and the owner of the store told you the store owed a contractor $100 for fixing a hole in the roof and asked would you like to assume that debt and you said no, and later the owner defaulted on his debt to the contractor. Could the contractor sue you for interfering with his right to collect the debt? That would be ridiculous. Feinberg's argument seems less ridiculous only because the defendant bought the store's entire assets. But the principle is the same, and brings us back to Feinberg's claim against RM under ERISA's section 502. A buyer of assets has, with exceptions inapplicable to this case, no obligation to assume the seller's liabilities.

AFFIRMED.