In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3705

TEAMSTERS LOCAL UNION NO. 705, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BURLINGTON NORTHERN SANTA FE, LLC
(f/k/a Burlington Northern Sante Fe
Corporation), *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 7378 — **Samuel Der-Yeghiayan**, *Judge*.

ARGUED OCTOBER 23, 2012 — DECIDED JANUARY 24, 2014

Before FLAUM and SYKES, *Circuit Judges*, and RANDA, *District Judge*.[*]

_____

[*] The Honorable Rudolph T. Randa, District Judge for the United States

(continued...)

SYKES, *Circuit Judge*. Berkshire Hathaway, Inc., owns a group of railway companies affiliated with the Burlington Northern Santa Fe railroad, which in turn owns the Corwith Intermodal Rail Yard in Chicago. (For simplicity, we refer to these companies and their corporate parent as "the Railroad.") From 2000 to 2010, the Railroad used an independent contractor, Rail Terminal Services, Inc. ("RTS"), to operate Corwith. The Teamsters Local Union No. 705 represented RTS's employees, who were covered by the union's health-and-pension plan. The Railroad contributed to the plan, as required by its contract with RTS.

In 2010 the Railroad decided to take the Corwith work in-house. Before doing so, however, the Railroad asked for wage-and-benefits concessions from Local 705. The union agreed. But when the Railroad ended its relationship with RTS and moved the Corwith work in-house, it entered into a labor agreement with a different union, the Transportation Communications International Union ("TCIU"). RTS advised its Corwith employees of the Railroad's decision and terminated their employment. The employees could reapply with the Railroad, but its wage-and-benefits package with TCIU was not as generous as the agreement between RTS and the Teamsters.

Local 705 and six employees filed this proposed class action against the Railroad, RTS, and TCIU, alleging several claims for violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and conspiracy to

---

* (...continued)
District Court for the Eastern District of Wisconsin, sitting by designation.

violate ERISA. The district court dismissed the complaint for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The plaintiffs have narrowed their case on appeal, focusing on just two claims: (1) unlawful interference with the attainment of retirement benefits in violation of § 510 of ERISA, 29 U.S.C. § 1140; and (2) a related conspiracy claim.

We affirm the dismissal of these claims. As relevant here, § 510 of ERISA makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant" in an employee benefits plan for the purpose of interfering with his attainment of benefits under the plan. 29 U.S.C. § 1140. Although liability under this statute is not limited to employers, the plaintiffs allege only an unlawful "discharge," which presupposes an employment relationship. Only RTS was in an employment relationship with the members of Local 705, so the district court properly dismissed the § 510 claim against the other defendants.

As to RTS, the § 510 claim fails for a different reason. The complaint alleges that RTS discharged the employees because it lost its contract to perform the work at Corwith, not for the purpose of interfering with their attainment of pension benefits.

Finally, the conspiracy claim was properly dismissed because ERISA does not provide a cause of action for conspiracy. To the extent that the claim is premised on Illinois common law of conspiracy, it is preempted. *See id.* §§ 1132(a), 1144(a).

## I. Background

This case comes to us on appeal from a Rule 12(b)(6) dismissal, so we take the following facts from the amended complaint. The Railroad owns Corwith Yard in Chicago and until 2000 operated it through a subsidiary.[1] In May 2000 the Railroad contracted with RTS to operate Corwith. As an independent contractor, RTS used its own employees to perform the work at the rail yard.[2]

Teamsters Local 705 represented the RTS employees who worked at Corwith. In fact, Local 705 had been the labor representative for the employees at Corwith for more than 60 years. Local 705 members were eligible to participate in the union's pension plan. Participants who attained 25 years or more of service were eligible for a full service pension, which (unlike early pensions) paid "unreduced pension benefits calculated at the highest rate and with no reduction for age." In other words, the more years of service a participant had, the higher his pension would be. We do not know much more

---

[1] The Railroad defendants are Burlington Northern Santa Fe, LLC (f/k/a Burlington Northern Santa Fe Corporation); BNSF Railway Company; Santa Fe Terminal Services, Inc.; and Berkshire Hathaway, Inc. Santa Fe Terminal Services, Inc., was a subsidiary of BNSF Railway and operated Corwith Yard in Chicago until May 2000; it no longer exists. Berkshire Hathaway owns these Burlington Northern affiliates.

[2] In addition to RTS, the amended complaint names two companies identified as RTS's corporate parents: Rail Management Services, LLC, and Carrix, Inc. We refer to the RTS defendants collectively as "RTS" unless the context requires otherwise.

about the employee benefits plan except that the Railroad made contributions to it as required by contract.

In 2010 the Railroad decided to stop outsourcing the work at Corwith and move it in-house. Before making this change, the Railroad demanded wage-and-benefits concessions from Local 705 amounting to over $1 million. Local 705 agreed. Despite these concessions, however, when the Railroad terminated its contract with RTS and took the Corwith work in-house, it entered into a labor agreement with TCIU. This agreement contained lower wage scales and a 401(k) retirement plan instead of a pension, and the Railroad was not obligated to make contributions to the employees' 401(k) accounts.

In October 2010 RTS informed Local 705 and the Corwith employees that it was losing its contract to provide services at Corwith and the employees would be laid off at the end of the year. RTS explained that the employees could apply to work for the Railroad, but they would lose the seniority they had acquired at RTS and their wages and benefits under the labor agreement between the Railroad and TCIU were likely to be less generous than they were under RTS's agreement with the Teamsters.

Local 705 and six individual union members filed this proposed class action against the Railroad, RTS, and TCIU, alleging claims under § 510 and § 511 of ERISA and also asserting a claim for civil conspiracy.[3] The plaintiffs (we refer

---

[3] The Railroad argues that Local 705 lacks standing, but our decision in

(continued...)

to them collectively as "Local 705") quickly filed an amended complaint, and the defendants moved to dismiss it for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The district court granted the motion and dismissed all claims against all defendants. The court swiftly dispatched the claim under § 511 of ERISA; that section allows for criminal penalties, not a private civil cause of action. *See* 29 U.S.C. § 1141 (making it a crime to use fraud, force, threats, or violence to restrain, coerce, intimidate a participant or beneficiary of an employee benefits plan).

Turning to the § 510 claim, the court noted that neither the Railroad nor TCIU had an employment relationship with the Corwith employees, so they could not be liable for unlawfully discharging them in violation of the statute. *See id.* § 1140 (making it unlawful to "discharge … a participant" of an employee benefits plan "for the purpose of interfering with the attainment" of benefits under the plan). As for RTS, the employer, the court held that the § 510 claim failed because the amended complaint alleged that RTS discharged the Corwith employees because it lost its contract with the Railroad, not for the purpose of preventing them from attaining pension benefits. Finally, the court dismissed the conspiracy claim because ERISA does not provide for a cause of action for

---

[3] (…continued)

*Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919, 921–22 (7th Cir. 2003), forecloses that argument. In any event, the individual plaintiffs have standing, and "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011).

conspiracy and preempts any conspiracy claim rooted in state law. Alternatively, the court held that the amended complaint did not plead sufficient facts to plausibly allege the existence of a conspiracy.[4]

Local 705 timely appealed.

## II. Discussion

We review the district court's Rule 12(b)(6) dismissal order de novo, accepting the allegations in the amended complaint as true and drawing reasonable inferences in favor of the plaintiffs. *See Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 908 (7th Cir. 2013). Local 705 challenges only the dismissal of its claim under § 510 of ERISA and the related claim for civil conspiracy. We begin with the conspiracy claim, then move to the § 510 claim for unlawful interference with the attainment of retirement benefits.

---

[4] Regarding the corporate parents and affiliates of RTS and BNSF Railway (Berkshire Hathaway, Burlington Northern Santa Fe, Santa Fe Terminal Services, Rail Management Services, and Carrix), the court also held, as an independent ground for dismissal, that the amended complaint failed to allege any specific wrongdoing by them. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000) (explaining that parent corporations and their subsidiaries are "separate entities and the acts of one cannot be attributed to the other"). Local 705 does not mount a serious challenge to this ruling on appeal.

### A. Conspiracy to Interfere with the Attainment of Benefits Protected by ERISA

The amended complaint alleges that the defendants conspired to interfere with the Corwith employees' attainment of benefits under the Teamsters' pension plan. It does not specify the legal source of this claim. Local 705 urges us to recognize a federal cause of action for conspiracy to violate § 510 of ERISA. We reject this argument for several reasons.

First, ERISA does not contain an express cause of action for conspiracy to violate § 510. Section 510 makes it unlawful to take certain adverse actions against the participants in an employee benefits plan for the purpose of interfering with their attainment of benefits under the plan. 29 U.S.C. § 1140. But the statute nowhere mentions conspiracies or unlawful agreements to interfere with the attainment of benefits. *See id.* Section 502(a) of ERISA provides a civil cause of action for the private enforcement of rights protected by § 510, *see id.* § 1132(a)(3); *see also Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1133 (7th Cir. 1992), but it, too, lacks any reference to a cause of action for conspiracy. ERISA is simply silent on the subject.

It is canonical that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *see also Nw. Airlines, Inc. v. Transp. Workers Union*, 451 U.S. 77, 94 n.30 (1981) (" 'A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other reme-dies.' " (quoting *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R.*

*Passengers*, 414 U.S. 453, 458 (1974))). The Supreme Court has held that this presumption applies with extra force in the context of ERISA, which provides a comprehensive and integrated enforcement scheme. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–48 (1985). Time and again the Court has cautioned that ERISA offers little room for implied causes of action or remedies, recognizing that the statute's enforcement scheme was the product of detailed study and a careful balancing of competing interests. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209–10 (2002); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254, 262–63 (1993); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *Russell*, 473 U.S. at 146–48.

Accordingly, there is no basis for recognizing an implied cause of action for conspiracy to violate § 510. ERISA's comprehensive enforcement scheme already safeguards against interference with the attainment of benefits by providing a civil cause of action for the private enforcement of the substantive rights conferred by § 510.

Moreover, although the Supreme Court has endorsed the court's authority to develop a federal common law pertaining to the rights and obligations protected by ERISA, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *Pilot Life*, 481 U.S. at 56, this "power … to create a substantive federal common law of contracts and trusts" is distinct from the "far more circumscribed power to augment ERISA's remedial provisions," *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 541 (7th Cir. 1991); *see also Buckley Dement, Inc. v. Travelers Plan Adm'rs of Ill., Inc.*, 39 F.3d 784, 789–90 (7th Cir. 1994). Our

"authority … to develop a 'federal common law' … is not the authority to revise the text of the statute." *Mertens*, 508 U.S. at 259.

For instance, we have previously declined to use this limited common-law authority to extend liability to persons beyond ERISA's explicit reach—namely, nonfiduciary professionals who assist plan administrators in complying with reporting requirements. *See Pappas*, 923 F.2d at 541. Similarly here, extending the reach of ERISA to cover conspiracies to violate § 510 would effectively revise the text of the statute and augment ERISA's remedial provisions; as such, it would be an improper use of our limited authority to develop a federal common law under ERISA.

Local 705 relies on the Ninth Circuit's opinion in *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Railway*, 80 F.3d 348 (9th Cir. 1996), *vacated*, 520 U.S. 510 (1997), but that decision did not go so far as to explicitly recognize a cause of action for conspiracy to violate § 510. The facts of *Inter-Modal* are the opposite of the facts here: The plaintiffs lost their jobs when a railroad company ceased using a subsidiary and outsourced its work to an independent contractor. 80 F.3d at 349–50. The plaintiffs sued the railroad company, its subsidiary, and the independent contractor for (among other claims) conspiracy to interfere with their attainment of ERISA benefits in violation of § 510. *Id.* at 350.

In a terse footnote at the beginning of its opinion, the Ninth Circuit rejected the outside contractor's argument that § 510 "does not support a cause of action against a non-employer for conspiring with an employer to interfere with ERISA-protected

benefits." *See id.* at 350 n.5. The court analogized to its earlier opinion in *Tingey v. Pixley-Richards West, Inc.*, which had held that "an insurer who coerces an employer to fire an employee must be covered by [§ 510's] language." 953 F.2d 1124, 1132 n.4 (9th Cir. 1992). The holding in *Tingey* was based on the panel's observation that § 510's prohibitions apply to "any person," not just employers. *Id.* Relying on this passage in *Tingey*, the court in *Inter-Modal* found "no basis for distinguishing a coercive insurer from a successor … who conspires with an employer to interfere with ERISA-protected rights." 80 F.3d at 350 n.5.

This cursory discussion in a single footnote cannot be understood as a formal ruling recognizing an implied statutory cause of action for conspiracy to violate § 510. The Ninth Circuit never meaningfully addressed the statutory text, the presumption against implied statutory causes of action, or the limits of the court's power to develop federal common law in the context of ERISA. We also question whether *Tingey*—the Ninth Circuit precedent cited in the *Inter-Modal* footnote— would support the extraordinary step of recognizing an implied conspiracy cause of action under ERISA. Indeed, *Tingey* makes no mention of conspiracy allegations at all. In short, Local 705 reads the *Inter-Modal* footnote for much more than it's worth. The case does not support recognizing a conspiracy cause of action here.

Moreover, where ERISA omits a cause of action for conspiracy to interfere with employee benefits, Illinois law cannot fill the void. Subject to a few inapplicable exceptions, ERISA § 514(a) preempts all state laws that "relate to any employee

benefit[s] plan." 29 U.S.C. § 1144(a). Locating the boundaries of this very broad preemption language has sometimes been difficult, *see N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 773 (7th Cir. 2002), but the preemption question here is fairly straightforward. The Supreme Court has held that Congress intended ERISA's comprehensive civil enforcement scheme to be exclusive. *See, e.g.*, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004); *Pilot Life*, 481 U.S. at 54–56. As such, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Davila*, 542 U.S. at 209.

Thus, on its own, the civil enforcement scheme in § 502(a) has "extraordinary pre-emptive power" that extends to ordinary common-law causes of action. *Id.* (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143–45 (1990). Section 502(a)'s uniform enforcement scheme "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002). It "represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life*, 481 U.S. at 54. As the Supreme Court has observed, "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal

scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.*

Accordingly, the district court's decision to dismiss the conspiracy claim was correct on several grounds. First, ERISA does not provide an express cause of action for conspiracy to interfere with the attainment of benefits in violation of § 510. Second, it would be improper for us to recognize an implied claim for conspiracy to violate § 510 or to adopt one under the federal common law. And third, if the plaintiffs' conspiracy claim is premised on state law, it is preempted.

## B. Section 510 Claim for Interference with Attainment of Benefits

As relevant here, ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant [in an employee benefits plan] … for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. A § 510 claim requires a showing of specific intent to interfere with the participant's attainment of benefits. *Nauman v. Abbott Labs.*, 669 F.3d 854, 857 (7th Cir. 2012). Actions that only incidentally affect the participant's benefits under a plan do not violate § 510. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005). The intent to frustrate the attainment of benefits must have been at least a motivating factor for the adverse action against the plan participant; whether but-for causation is required is a question we can leave for another day. *See Nauman*, 669 F.3d at 857 & n.2.

The § 510 claim here is premised on allegations that the Corwith employees were unlawfully discharged in violation of the statute. The term "discharge" as used in § 510 presupposes an employment relationship; only an employer can discharge an employee. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011) (recognizing that discharge is "what an employer does to an employee"); *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 (D.C. Cir. 1995) (recognizing "discharge" as involving "employment termination").

We are not saying that only employers can be liable for violating § 510—although some of our opinions can be read to suggest as much. *See Andersen v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996); *McGath v. Auto-Body N. Shore, Inc.*, 7 F.3d 665, 668–69 (7th Cir. 1993); *Deeming v. Am. Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990). As we have recently explained, this language was dicta, and any assumption that only employers can be liable under § 510 was ill founded. *See Feinberg*, 629 F.3d at 675.

By its terms, § 510 does not condition liability on the existence of an employment relationship. It restrains "any person," not just employers. *See* 29 U.S.C. § 1140; *see also Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 421 (4th Cir. 1993). And "person" is defined as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). Because the statute also separately defines "employer," *id.* § 1002(5), "we must assume that Congress used the [broader] term 'person' deliberately," *Custer*, 12 F.3d at 421.

Moreover, the list of prohibited actions is not limited to those capable of being performed by employers; nonemployers can engage in at least some of the acts prohibited by § 510. *See Feinberg*, 629 F.3d at 675; *Custer*, 12 F.3d at 421. For example, § 510 could apply to certain actions taken by unions. *See Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir. 1997). A union is a "person" as defined by § 1002(9), and "two of the words used to describe illegal conduct [in § 510], 'fine' and 'expel,' are … commonly used in connection with actions of a union against a member." *Id.* And both employers and nonemployers can discriminate against plan participants and beneficiaries in a manner that violates § 510. *See id.* at 805–06; *Custer*, 12 F.3d at 421.

Here, however, the § 510 claim rests entirely on allegations of unlawful discharge. The amended complaint does not allege that the defendants fined, suspended, expelled, disciplined, or discriminated against the plaintiffs. Accordingly, the claim cannot go forward against the Railroad or TCIU, neither of which had an employment relationship with the Corwith employees.

On the other hand, RTS employed the laborers at Corwith, but here the plaintiffs' allegations are insufficient in a different respect. The amended complaint alleges that RTS laid off its work force at Corwith because the Railroad ceased outsourcing the work at the rail yard to it. Without a contract to perform the work, RTS no longer had any need to employ the union's members at Corwith; as a consequence of losing its contract with the Railroad, the company discharged its Corwith employees. The amended complaint does not allege that RTS's

discharge decision was motivated by a specific intent to frustrate the employees' attainment of pension benefits. Nor are there sufficient factual allegations to support a reasonable inference the RTS acted with that intent. Accordingly, the § 510 claim fails against all the defendants.

For the foregoing reasons, the district court properly dismissed the amended complaint for failure to state a claim.

AFFIRMED.